IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | |
|---|---|
| PHILIP C. WEISS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 05:05-CV-00527-JMH |
| | ) |
| FUJISAWA PHARMACEUTICAL CO., | ) Electronically Filed |
| LTD., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS, PHILIP C. AND CASSANDRA WEISS'
OPPOSITION RESPONSE TO DEFENDANT ASTELLAS PHARMA US, INC.'S
MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

## I.     INTRODUCTION

Plaintiffs, Philip C. Weiss ("Weiss") and Cassandra Weiss, filed this products liability suit after Weiss suffered severe personal injuries caused jointly from his use of two topical immunosuppressant prescription medications designed to treat atopic dermatitis.  Astellas Pharma US, Inc. ("APUS") manufactured, marketed and sold Protopic, and Novartis Pharmaceuticals Corporation ("Novartis") manufactured, marketed and sold Elidel, both of which were prescribed to and used by Weiss, including free samples given out by company sales representatives.  As a proximate result of exposure to these drugs, Weiss developed a cutaneous lymphoma at the application site where both immunosuppressant drugs were applied.

In an effort to ensure that crucial evidence would not be spoliated or lost, Weiss' counsel sent APUS and Novartis letters dated February 9, 2006, outlining various categories of relevant documents and, *inter alia*, requesting these defendants not "destroy, discard or spoliate any evidence with respect to either the Protopic or the Elidel products."  A copy of the February 9, 2006 letter is attached to APUS' Memorandum In Support of Motion For Protective Order

("APUS' MPO Memo"). However, APUS, unlike Novartis, now objects to any duty of preserving critical documents and seems unconcerned about their spoliating evidence, or its consequences. On February 10, 2006, APUS' counsel responded to counsel for Plaintiffs' letter and rejected the communication as objectionable. (Id.) Thereafter, APUS' counsel on March 6, 2006 sent another letter specifically objecting to the request for document preservation.

Although Weiss has been unable to propound discovery because of defendant's removal to federal court,[1] APUS' counsel has now sought out an improper procedural remedy, on non-existent discovery requests, Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure "that any obligation to preserve does not extend to documents or materials (1) of foreign countries, (2) regarding Prograf® or any other formulation containing tacrolimus,[2] and (3) of third-party clinical investigators."[3] (APUS' MPO Memo. at p. 3.)

APUS' Motion is both procedurally and substantively deficient. Procedurally, what APUS seeks this Court to do does not rise to the level of a constitutionally justiciable issue or controversy for which jurisdiction exists; APUS does not have standing to request a Protective Order where no discovery is outstanding to them; their MPO is not ripe for adjudication; and, the APUS Motion is nothing more than a veiled attempt to lure this Court into an advisory opinion giving judicial imprimatur to APUS' selective destruction/spoliation of crucial documentary evidence. Furthermore, APUS has not established, in any regard, the necessary good cause showing required by the Federal Rules to obtain a Protective Order.

---

[1] Weiss served interrogatories and requests for production to APUS in the state court action prior to the defendant's removal of the cause to this Court. Nevertheless, Weiss' state court document requests did not encompass in its entirety all the materials referenced in the informal correspondence to APUS that is the basis for APUS' Motion for Protective Order, but many of the items were included in the RFP.

[2] Prograf has the identical biologically active molecular structure as Protopic. Prograf is a drug which APUS' predecessor corporation, Fujisawa, obtained new drug approval from the FDA. APUS' clinical studies and animal studies confirm that the immunosuppressants in Prograf and Protopic can lead to rapid and substantial absorption into the body system, and even systemic involvement of the immune system. Moreover, in support of Protopic's NDA, APUS utilized and relied on selective Prograf studies.

[3] No similar Motion for Protective Order has been filed by the other Defendant, Novartis.

Finally, APUS' Motion fails substantively because all foreign country materials of Protopic, sold under the same trade name, documents regarding Prograf, which has the identical biologically active molecular structure as Protopic, and third-party documents, are highly relevant to the claims at hand. As such, this Court should first either decline to hear the merits of APUS' Motion, or dismiss it out of hand for substantive reasons.

## II.        PROCEDURAL ARGUMENT

Irrespective of APUS' Motion and dispute with Weiss regarding the preservation Letter, there is <u>not</u> a sufficiently concrete and adverse "dispute" to satisfy the requirements of Article III, Section 2 of the United States Constitution. APUS seeks an Order not based on a discovery request; a pre-discovery Protective Order is unfounded. Moreover, APUS does not have standing to seek any Protective Order at this time. APUS' corporate fear of a hypothetical discovery request is an insufficient reason for this Court to even hear APUS' request for a protective order. Because APUS' Motion is procedurally deficient, jurisdiction is lacking to adjudicate it, and the Court need not, and should not ever need to reach the overwhelming substantive opposition; but if the Court reaches that point, as will then be realized, the APUS Motion must be rejected.

### a.  APUS' Motion is Not Justiciable

APUS' Motion For Protective Order is not justiciable. Article III of the United States Constitution limits courts to adjudication of "actual, ongoing cases or controversies." *See* U.S. CONST. ART. III, § 2; <u>Lewis v. Cont'l. Bank Corp.</u>, 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, (1990); *see also,* <u>Associated Indus. of Ky. v. Commonwealth</u>, 912 S.W.2d 947, 951 (Ky. 1995). Even if a court has subject matter jurisdiction over a case, "there remains a question of whether a particular cause is justiciable." <u>Fisher v. U.S.</u>, 364 F.3d 1372, 1381 (Fed. Cir. 2004), *Op. vacated* by <u>Fisher v. U.S.</u>, 403 F.3d 1307 (Fed. Cir. 2005).

"Justiciability has both constitutional and prudential dimensions, and encompasses a number of doctrines under which courts will decline to hear and decide a cause. Though justiciability has no precise definition or scope, doctrines of standing [and] ripeness … are within its ambit." *Id.*, *citing* 15 JAMES WM. MOORE, ET. AL., FEDERAL PRACTICE § 101.01 (3rd ed. 2003); 13 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3529 (2d ed. Supp. 2003). Where a court's opinion is sought merely to assist a party in some possible future litigation, justiciability principles argue against assuming jurisdiction. *See* Grimm v. Shroyer, 35 F. Supp.2d 966, 972 n. 8 (E.D. Ky. 1999); In re Commercial Fin. Serv's., Inc., 247 B.R. 828 (N.D Okla. 2000) (holding that "a live controversy exists" in the context of a request for Protective Order, in part, where "discovery has been propounded").

The purpose behind requiring a litigant to present an actual controversy is that the courts are not authorized to give advisory opinions on hypothetical factual situations. *See* Grimm, 35 F. Supp.2d at 972; *see also* Adcock v. Firestone Tire and Rubber Co., 822 F.2d 623, 627 (6th Cir. 1987); State of Ohio ex rel. Celebrezze v. U. S. Dep't of Transp., 766 F.2d 228, 232 (6th Cir. 1985) ("The requirements of standing [and] ripeness … guard against the issuing of advisory opinions."); Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959 (1969). For example, federal courts in Kentucky have stated they cannot grant advisory opinions or rule on hypothetical questions, but rather must rule on real disputes. *See* Grimm, 35 F. Supp.2d at 972. The Court of Appeals for the Sixth Circuit requires adherence to this fundamental principle. In re Post-Newsweek Stations, Michigan, Inc., 722 F.2d 325, 328 (6th Cir. 1983) ("It is settled doctrine that we do not render advisory opinions.").

This Court must not even consider APUS' non-justiciable Motion For Protective Order. APUS is already on notice of discovery requests seeking the same information they were asked

4

to preserve by Plaintiffs' counsel's letter and not to spoliate which have now been served on them in other cases involving injuries caused by their product.[4]  By submitting its Motion For Protective Order before having any federal discovery propounded, *sub judice*, APUS seeks nothing more than this Court's rubber-stamp approval to destroy potentially relevant evidence. Should APUS obtain a Protective Order, then arguably a "rush to the shredder" would begin *en masse* before more suits are filed.  Moreover, APUS will undoubtedly parade this Court's Order across the country as its *carte blanche* justification for the destruction of documents thereby prejudicing other plaintiffs in similar cases who might never then get their day in court.

APUS is clearly aware that other related litigation is on the horizon.  The FDA has required a Black Box cancer warning on their product, Protopic.  Further, 14 deaths have been associated with the product through 6/30/05, with nearly 3.5 million prescriptions through November 2004, 7% of them to children under two years old (for which Protopic was specifically unapproved, although the company is alleged herein to have promoted use through their sales representatives by children under 2 years old).  APUS will strategically use their requested Order as a technical defense to its document destruction and spoliation,[5] and as judicial imprimatur for evidentiary destruction and spoliation in all national and worldwide Protopic-related actions.

---

[4] Presently, APUS has been sued for a Protopic death in State Court in Saint Louis, Missouri, in the Case of <u>Rucker v. Astellas Pharma US, Inc., et al.,</u> Case No. 05CC-6332.  If APUS wants to object to Prograf and other discovery, then that is the venue to do it in since discovery has been served on them in that case.  Attached as an exhibit is the RFP from the Missouri death case of a 9 year old child.  If the Court gives in to APUS they will then not retain relevant documents and tell these other courts that the Eastern District of Kentucky told APUS they don't have to preserve evidence.  See Plaintiffs' Exhibit "1".

[5] In a corollary situation a district court *denied* a plaintiff's non-discovery motion seeking to impose a preservation order on a defendant to keep them from destroying documents.  <u>In re:  African-American Slave Descendents' Litigation</u>, 2003 W.L. 24085346 (N.D. Ill. 2003).

**1. APUS Does Not Have Standing Under Rule 26**

APUS does not have standing to bring its Motion For Protective Order. Again, Article III of the United States Constitution requires that federal jurisdiction be limited to "cases" or "controversies." <u>United States v. Van</u>, 931 F.2d 384, 387 (6th Cir. 1991). One aspect of that limitation is standing, which requires that a party have an actual injury or claim. <u>Id.</u> (internal citations omitted). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." <u>T.H.E. Ins. Co. v. Naghtin</u>, 916 F.2d 1082 (6th Cir. 1990) (internal citations omitted).

Rule 26(c) requires that discovery be sought prior to a party's motion for Protective Order. The Rule's text states that, "[u]pon motion by a party or by the person <u>from whom discovery is sought</u> … and for good cause shown, the court … may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). (emphasis added). Moreover, "[a] motion … for a protective order, should generally be made by the person from whom the documents or things <u>are requested</u>." 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2459 (2d ed.1995) (emphasis added).

APUS' motion is not in response to any discovery request whatsoever in this case; it is based upon a series of extrajudicial letters written between the attorneys. There is no discovery for which Rule 26(c) could possibly apply herein. Weiss merely placed APUS on notice requesting them not to destroy or otherwise spoliate evidence. Being that the primary element of a Rule 26(c) requirement of "discovery is sought" does not even exist herein, the Motion For Protective Order is untimely, procedurally fatal and, accordingly, APUS lacks standing to move for a Protective Order.

## 2. APUS' Motion Is Not Ripe For Adjudication

The federal ripeness doctrine arose out of concerns regarding advisory opinions, and is aimed at preventing federal courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. *See* <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 148, 87 S.Ct 1507, 1515 (1967) *overruled on other grounds by* <u>Califano v. Sanders</u>, 430 U.S. 99 (1977). "'Ripeness is more than a mere procedural question; it is determinative of jurisdiction.'" <u>Bigelow v. Michigan Dep't of Natural Res.</u>, 970 F.2d 154, 157 (6th Cir.1992) (quoting <u>Southern Pac. Transp. Co. v. City of Los Angeles</u>, 922 F.2d 498, 502 (9th Cir.1990)); <u>Arnett v. Myers</u>, 281 F.3d 552, 562 (6th Cir. 2002).

A court cannot give an advisory opinion on an issue that has not yet ripened into an actual controversy. *See* <u>Sullivan v. Tucker</u>, 29 S.W.3d 805, 808 (Ky. Ct. App. 2000); *See also* <u>In re Constitutionality of House Bill No. 222</u>, 90 S.W.2d 692, 693 (Ky. Ct. App. 1936); <u>Int'l Union, UAW v. Dana Corp.</u>, 697 F.2d 718, 720-21 (6th Cir. 1983). Federal courts are presumed to lack jurisdiction unless "the contrary appears affirmatively from the record." <u>Presbytery of N. J. of the Orthodox Presbyterian Church v. Florio</u>, 40 F.3d 1454, 1462 (3d Cir. 1994) (internal citations omitted). Consequently, the ripeness inquiry focuses on the timing of defendant's motion. *Id.*; *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION §2.4 (1989) (noting that ripeness centers on whether an injury has occurred yet). Moreover, the issuance of a premature Protective Order is clearly erroneous. <u>United States. v. Bonanno Organized Crime Family of La Cosa Nostra</u>, 119 F.R.D. 625, 626 (E.D. N.Y. 1988).

APUS' Motion For Protective Order seeks relief from an informal, although important, attorney to attorney correspondence to refrain from spoliating or otherwise destroying potentially relevant evidence. In turn, APUS now seeks, in a vacuum, after being able to ignore the State Court discovery after Removal, to have this Court advise and give guidance to APUS

that it does not need to preserve "documents or materials (1) of foreign countries, (2) regarding Prograf®, or any other formulation containing tacrolimus, and (3) of third-party clinical investigators." APUS' MPO Memo. at p. 3. APUS' practice of seeking this Court's approval/determination of what documents may or may not be destroyed, disposed of, and spoliated – prior to any formal discovery request and discovery obligation – is entirely improper.

If the Court were to assume jurisdiction over APUS' Motion For Protective Order it would be in derogation of all common law precedents. An Order granting APUS' request would potentially result in dire consequences. Rule 26(c) Motions For Protective Orders will become a commonplace pre-discovery tactic. Large companies facing potentially mass tort litigation will go in on the first case to get a court to "counsel", guide and "advise" it about corporate document preservation and retention. Prior to any document request, interrogatory, request for admission or otherwise, companies will effectively pre-empt meaningful discovery by seeking Protective Orders through advisory opinions as to whether certain evidence, which the court has never even seen, nor the plaintiff, may be spoliated or destroyed. *See* H.S. Stanley v. Trinchard, 2004 WL 1562850, at * 1 (E.D. La. 2004) (request for protective order is premature, i.e. prior to discovery, where a party may simply object and refuse to answer the discovery); Falkenberg Capital Corp. v. Dakota Cellular, Inc., 1998 WL 552966, at * 3 (D. Del. 1998) (holding that a letter notifying adverse party of potential discovery requests "is simply too remote and uncertain to justify present adjudication [and] any ruling [on the proposed discovery] would be premature … since there is no concrete hardship."); *See also* In re Wright, 220 B.R. 543 (S.D. N.Y. 1998) (denying a Protective Order when party sought court "to determine in advance the legal effect of future testimony in context where the testimony [wa]s as yet unspecified"). Such a practice would clearly deviate from established constitutional principals. Further, there is no way, at this juncture, that the Court could even determine its Rule 26, 30, 34, and 37 obligations,

including the liberal discovery parameters of relevancy and reasonably calculated to be had as admissible evidence, within the hypothetical abstract environment APUS seeks to impose upon this bench.

### b. APUS Has Not Demonstrated the Requisite Good Cause Necessary to Obtain a Protective Order.

APUS' request for a Protective Order falls short of the Federal Rule's requirements. Rule 26(c) governs Protective Orders in civil matters; it permits a Protective Order only upon a showing of good cause. This is required in order to shield a litigant against "annoyance, embarrassment, oppression or undue burden or expense." *See* Knoll v. AT&T, 176 F.3d 359, 365 (6th Cir. 1999). The burden of establishing good cause rests with the movant. Lewis v. St. Luke's Hosp. Ass'n, 132 F.3d 33, 1997, 1997 U.S. Dist. LEXIS 34854 (6th Cir. 1997) (internal citation omitted). Although the district court has broad discretion to grant or deny Protective Orders, such discretion is "limited by the careful dictates of Fed. R. Civ. P. 26." Procter & Gamble Co. v. Bankers Trust Co., 78 F.3d 219, 227 (6th Cir. 1996).

To show good cause a movant must articulate specific facts clearly showing defined and serious injury resulting from the discovery sought; the movant, in this case APUS, cannot rely on mere conclusory statements. Nix v. Sword, 11 Fed. Appx. 498, 2001 U.S. App. LEXIS 11328 (6th Cir. 2001); Beckman Indus. Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir. 1992) (holding that "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test."); Deford v. Schmid Prods. Co., 120 F.R.D. 648, 653 (D. M.D. 1987) (requiring party to provide "specific demonstrations of fact, support where possible by affidavits and concrete examples, rather than broad conclusory allegations of potential harm"). A party asserting good cause also bears the burden of showing that specific prejudice or harm will result if a Protective Order is denied. This burden applies to each particular document the movant seeks to protect. San Jose Mercury News, Inc. v. U.S. Dist. Court, 187 F.3d 1096, 1102

(9th Cir. 1999) (reiterating that a Protective Order movant must make a "particularized showing of good cause with respect to any individual documents"); <u>Philips v. GMC</u>, 307 F. 3d 1206, 1212 (9th Cir. 2002) (internal citations omitted).

Discovery in the form of document production will always impose some burden on the party from whom the discovery is sought. The fact that discovery will require the objecting party to expend considerable time, effort and expense alone is not sufficient to disallow the discovery unless the requests are egregiously burdensome or oppressive. <u>Roesburg v. Johns-Manville Corp.</u>, 85 F.R.D. 292, 297 (D.C. Pa. 1980); <u>Isaacs v. Shell Oil Co.</u>, 83 F.R.D. 428, 431 (E.D. Mich. 1979) (discovery may not be avoided because it may involve inconvenience or expense). Furthermore, the court must balance the interests at issue, and compare the hardship on both parties if the motion is either granted or denied. <u>York v. Am. Med. Sys.</u>, 166 F.3d 1216 (6th Cir. 1998). Rule 26 speaks of "undue burden or expense" and discovery should be allowed unless the hardship is unreasonable in the light of the benefits to be secured from the discovery. Fed. R. Civ. P. 26(c).

Furthermore, any affidavit or declaration attempting to demonstrate good cause for the issuance of a Protective Order must contain a particular and specific demonstration of fact rather than stereotyped conclusory statements and broad allegations of harm, unsubstantiated by specific examples or articulated reasoning. <u>Cippollone v. Liggett Group, Inc.</u>, 785 F.2d 1108, 1121 (3rd Cir. 1986) A detailed explanation as to the nature and extent of the claimed burden or expense is typically required. <u>Aikens v. Deluxe Fin. Servs., Inc.</u>, 217 F.R.D. 533, 536-37 (D. Kan. 2003) (internal citation omitted).

APUS has failed to allege any specific fact supporting its broad conclusory allegations of harm. It merely contends that Weiss' demands are "without merit and unreasonable. [Weiss] seeks documents that are irrelevant to any issue in this case and his requests would impose a

tremendous time and financial burden on APUS." APUS' MPO Memo at p. 3. Such broad and conclusory allegations, absent a specific factual basis establishing potential harm, are wholly incapable of rising to a good cause level for the issuance of a Protective Order.

Based simply upon its corporate magnitude and revenues, APUS cannot seriously argue that the relevant preservation requests create any undue burden or expense warranting the issuance of a Protective Order. APUS is a multinational pharmaceutical conglomerate, with annual net sales exceeding eight billion dollars ($8B) per year.[6] In fact, Protopic, the drug at issue before this Court, had sales last year of two hundred million dollars ($200M) in the United States alone.[7] It is sold as Protopic in many international markets – exactly the same drug. APUS in its affidavit and pleading failed to articulate any action which must be undertaken that would be considered unduly burdensome or oppressive. While arguing that preserving relevant documents will be time and cost prohibitive, APUS fails to specify any good faith cost, time estimates, labor hours, or dollars required to preserve this documentary evidence. Actually, APUS totally undermines and contradicts its own arguments when it stated that such documents have been and are continually being maintained (and have been maintained for over 20 years). APUS' MPO Memo. at p. 5 (emphasis added). Now that they are being sued APUS suddenly seeks a contrary policy and wants to dump the documents, particularly ones they know might be harmful.

In addition, the Declaration of Catherine B. Levitt, APUS' general counsel, does nothing to establish good cause. Notwithstanding, this declaration is totally insufficient. Ms. Levitt's declaration is devoid of any detailed explanation of APUS' claimed burden or expense in

---

[6] According to Astellas Pharma Inc.'s Annual Report, for the year ending March 31, 2005, under the heading of Key Financial Data , the Net Sales in the United States (as listed as US $ in millions is $8,056 or $8,056,000,000.00).

[7] According to Astellas Pharma Inc.'s Annual Report, for the year ending March 31, 2005, under the Heading of Net Income and Top-selling ethical pharmaceuticals, on page 56, Protopic® (as listed as US $ in millions as $200 or $200,000,000.00).

preserving the relevant documents. *See generally* Ms. Levitt's Declaration [hereinafter Levitt Decl.]. Rather than provide information about APUS' document retention program, or evidence of one, Ms. Levitt merely states that retaining relevant documents will be costly and expensive. Levitt Decl. at ¶ 7. Since absolutely no details are given, such conclusory statements are ineffectual. Moreover, Ms. Levitt confirms the inconsistent positions by APUS' through their admissions on one hand that the requested documents have been and are continuously being maintained, and on the other that they can't keep them. Levitt Decl. at ¶ 4; APUS' MPO Memo. at p. 5. So why are they now seeking an Order for spoliation once they are sued? This tactic does not pass the smell test. APUS has simply failed to meet its burden of showing good cause, and, as such, is not entitled to a Protective Order.

## III. SUBSTANTIVE ARGUMENTS

If this Court decides to reach the merits of APUS' Motion, the substantive facts compel a finding that the Motion should be Denied. APUS seeks a Protective Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure "that any obligation to preserve does not extend to documents or materials (1) of foreign countries, (2) regarding Prograf® or any other formulation containing tacrolimus, and (3) of third-party clinical investigators."[8] APUS' MPO Memo. at p. 3. The following analysis demonstrates the relevance and necessity of discovering documents related to each of these three broad categories.

All documents that Weiss seeks are relevant and discoverable. Under Rule 26, all parties are liberally permitted to obtain discovery regarding any matter, not privileged, which is relevant to the claims or defenses of any party. Fed. R. Civ. P. 26(b)(1). Material is discoverable if it is relevant to the subject matter of the action or is "reasonably calculated to lead to the discovery of

---

[8] No similar Motion for Protective Order has been filed by the other Defendant, Novartis despite receiving the same preservation letter.

admissible evidence." <u>Id</u>.  Additionally, under Federal Rule of Evidence 401, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

### 1.  Foreign Documents

APUS objects to Weiss' informal request that foreign Protopic documents be preserved. APUS' MPO Memo. at p. 4-5.  More specifically, APUS seeks a Protective Order permitting the destruction/spoliation of "all foreign country or worldwide documents, including documents regarding marketing and sales, for Protopic® Ointment, or any other marketing name used in a foreign country." <u>Id.</u> at p. 2.  APUS generally claims that these documents are "irrelevant." <u>Id.</u> at 4-5.  Regardless of their location abroad, these documents are highly relevant, and this Court has the jurisdictional authority to compel their production.  According to federal law, APUS has the obligation to ensure that these documents are preserved for this (and all other pending) litigation.  As such, APUS' request for this Court to enter an advisory opinion granting APUS the ability to destroy/spoliate relevant documents is wholly improper.

Upon the filing of a complaint, a defendant has the duty to preserve relevant evidence.

> 'While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, <u>it is under a duty to preserve</u> what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.'

<u>Skeete v. McKinsey & Co. Inc.</u>, 1993 WL 256659 (S.D. N.Y. 1993) (emphasis added), *citing* <u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 72 (quoting <u>Wm. T. Thompson Co. v. General Nutrition Corp., Inc.</u>, 593 F.Supp. 1443, 1455 (C.D.Cal.1984) (citations omitted)); *see also* <u>Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.</u>, 133 F.R.D. 166, 169 (D. Colo. 1990);

Cardenas v. Dorel Juvenile Group, Inc., 232 F.R.D. 377, 386-87 (D. Kan. 2005) (finding that discovery related to foreign products is relevant).

Moreover, a Federal District Court has the jurisdictional authority to require the defending party to preserve relevant documents held overseas. In re Anschuetz & Co., 754 F.2d 602, 607 n.9 (5th Cir. 1985) (holding that a party subject to federal court jurisdiction may be compelled to produce, and thereby preserve, documents irrespective of fact that documents are located in a foreign country), *overruled on other grounds*; Cooper Indus. v. British Aerospace, 102 F.R.D. 918, 919 (S.D. N.Y. 1984) ("the fact that documents are situated in a foreign country does not bar their discovery.") *citing*, Marc Rich & Co. v. United States, 707 F.2d 663, 667 (2d Cir. 1983) (grand jury investigation), *cert. denied*, 463 U.S. 1215, 103 S. Ct. 3555.

Even based on the limited number of FDA documents Weiss has been able to obtain through FOIA, Fujisawa/APUS' argument that foreign documents don't matter is simply ludicrous, and cannot pass the straight face test. It is quite amazing that APUS permits its attorneys to make these recommendations in light of the accuracy requirements under the Rules. For example, then Fujisawa Healthcare, now APUS, is a wholly owned subsidiary of the Japanese parent company (Fujisawa's Original New Drug Application to FDA dated 9/8/99 Re: NDA 50-777, Protopic (Tacrolimus ointment)). *See* Plaintiff's Exhibit "2". APUS' ability to manufacture and sell Protopic is based on patents, either owned or licensed by their parent company. (Id.) (For example, Patent No. 5,366, 971; 5, 665, 727) Numerous tests submitted to the FDA to support approval of Protopic were performed by "Fujisawa Pharmaceutical Co., Japan". (NDA – 50-777, Review and Evaluation of Pharmacology/Toxicology Data: Pharmacologist; Review, pp. 76, 78-79, 86 nn. 37-49, dated 6/22/00). There is an inextricable connection between the parent company, this drug, and the foreign documents.

14

The fact APUS now says foreign documents, kept already for 20 years, are irrelevant is certainly beyond belief. Approval for Protopic in the US market was partly because of foreign documents submitted to the FDA. Contrary to APUS' argument, the foreign Protopic documents are thus extremely relevant and material to this litigation, but Plaintiffs do not know the differences, i.e., in warnings, formulations, and marketing campaigns. Protopic is approved in many foreign markets.[9] Fujisawa (nka APUS) submitted its foreign market clinical trials to the FDA in support of Protopic's NDA. *See* Plaintiff's Exhibit "2". [Original New Drug Application submitted to FDA on September 8, 1999 from Fujisawa Healthcare Inc. Re: NDA 50-777 Protopic® (tacrolimus ointment)]. Fujisawa even submitted findings to the FDA from its European/Canadian clinical studies on pediatric patients. *See* Plaintiff's Exhibit "3" [Letter from Fujisawa to FDA dated 2/11/2000 referencing a European/Canadian clinical study (FG-06-19) submitted to FDA]. They also shared this information with Japanese and European Regulatory authorities. *See* Plaintiff's Exhibit "3" [Letter from Fujisawa to FDA dated 2/11/2000 referencing a European/Canadian clinical study (FG-06-19) submitted to FDA]. Yet, when they are sued, they suddenly try to assert foreign materials which helped them to sell this dangerous product in the US are meaningless.

Additionally, when Fujisawa submitted the Protopic NDA to the FDA on September 8, 1999, it included <u>extensive</u> supporting data from foreign market clinical trials. For instance, Fujisawa made representations to the FDA that studies conducted in Europe "are presented as fulfilling the International Conference on Harmonization recommendations for long term

---

[9] In fact, Protopic has been marketed, tested and/or approved in numerous foreign markets, including: Denmark, United Kingdom, New Zealand, Germany, Austria, Belgium, Switzerland, Puerto Rico, Israel, Finland, Central America, Latin America, Dominican Republic, Latvia, Greece, Luxemburg, Canada, Russia, Poland, Norway, Singapore, Taiwan, Netherlands, Sweden, Kuwait, Slovak Republic, Slovenia, Lebanon, Belarus, Portugal, Jordan, Malaysia, South Korea, Spain, Saudi Arabia, Hungary, Bangladesh, South Africa, United Arab Emirates, Lithuania, Estonia, Uruguay, Argentina, Philippines, Indonesia, Czech Republic, Turkey, Australia, Peru, Western Europe, Eastern Europe. IMS Health 2006

exposure." [Memorandum of Meeting (Meeting Number 3840) Dated April 6, 1999 Re: Pre-NDA meeting for Protopic IND (page 6)] *See* Plaintiff's Exhibit "4". The FDA requested that Fujisawa submit all data and reports of <u>foreign studies</u> as part of the approval process. [Memorandum of Meeting (Meeting Number 3840) Dated April 6, 1999 Re: Pre-NDA meeting for Protopic IND (page 7)] *See* Plaintiff's Exhibit "4". At Fujisawa (APUS') specific request the FDA agreed that these studies were adequate to support the requested Protopic disease indication for atopic dermatitis. [Memorandum of Meeting (Meeting Number 3840) Dated April 6, 1999 Re: Pre-NDA meeting for Protopic IND (page 6)] *See* Plaintiff's Exhibit "4".

Fujisawa used considerable foreign data, sufficiently relevant before this litigation, to fulfill FDA's requests for Protopic safety data. [NDA for Protopic 50-777]. In a letter dated June 2, 2000 to the FDA, Fujisawa stated that "[t]hese responses are based on Fujisawa <u>global safety data</u> as well as the literature and data obtained from Fujisawa company-sponsored clinical trials." [Letter to FDA from Fujisawa dated June 2, 2000 Re: Response to Request for Information from Clinical, Biopharmaceutics and Pharmacology/Toxicology Reviews] *See* Plaintiff's Exhibit "5". (emphasis added). Furthermore, since the FDA's decision to require that Fujisawa/APUS place a "black box" cancer warning on Protopic, just like its other drug, Prograf[®], many of the foreign markets have modified their original approvals and/or rescinded Protopic marketing approval for certain indications. [IMS Healthcare 2006 Re: Drug Profile (tacrolimus) February 2006] *See* Plaintiff's Exhibit "6".

Protopic non-US documents related to foreign materials are highly relevant to the case at hand. Evidence of clinical trial results and regulatory findings from these foreign, international markets serves to demonstrate APUS' prior knowledge of Protopic's inherent dangers. Fujisawa utilized these foreign documents to influence the FDA in its decision to approve the drug. As

such, APUS cannot seriously argue that the foreign Protopic documents are "irrelevant." This Court must deny APUS' request for a Protective Order as to the foreign Protopic documents.

## 2. Prograf Documents Are Crucial To This Case

Weiss has informally requested that APUS refrain from destroying, discarding and/or spoliating any documents related to its other immunosuppressant drug Prograf (also known as Tacrolimus, (FK 506)). APUS manufactured, marketed and sold Prograf.

Prograf and Protopic, the drug at issue in this case, have the identical biologically active molecular structure. In essence, they are the <u>same drug</u> – they share the exact same chemical make-up. (See 2004 Physicians' Desk Reference at 1323, 1327; *See also*: Div. Of Dermatologic and Dental Drugs, Review of Chemistry, Manufacture and Control, 12/6/00, at pgs 1-3). Plaintiff's Exhibit "7". Prograf also carries a Black Box cancer warning like Protopic. Because Prograf has a known history of causing cancer, and because Prograf and Protopic have the identical biologically active molecular structure, tacrolimus, Prograf-related documentary evidence is crucial to the case *sub judice*.

It is without scientific dispute that Prograf's cancer-causing effects due to tacrolimus are also present in Protopic. Nevertheless, APUS objects to Weiss' request to preserve Prograf documents as "irrelevant." APUS' MPO Memo. at p. 6-7. In an effort to avoid bad publicity and multiple lawsuits, APUS simply argues that it has no obligation to preserve Prograf documents because "Protopic® and Prograf® are disparate[,]" and because Weiss "did not take … Prograf®, nor use any other formulation containing tacrolimus." <u>Id</u>. at p. 7. This statement is false.

Despite APUS' misleading assertions, Prograf and Protopic are the same drug. Both drugs act as powerful macrolactum immunosuppressants who share the exact molecular entity, Tacrolimus, FK 506. *See* NDA 50-777, 50-709, 50-708, 50-737, 50-738. Prograf and Protopic

are designed to suppress a patient's immune system, which, in turn, restricts the body's ability to fight infections and the spread of malignant cells. [en.wikipedia.org/wiki/Immunosuppressant]. The only difference between Prograf and Protopic is the vehicle or way of administration – Prograf is usually ingested orally while Protopic is applied topically. APUS' MPO MEMO at p. 6. Their mechanism of action is the same.

Again, Federal Rule of Civil Procedure 26(b)(1) provides that a "party may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." This Rule is to be accorded broad and liberal treatment and encompasses any matter that reasonably could lead to admissible evidence. Hickman v. Taylor, 329 U.S. 495, 507 (1947); Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).

The scope of relevant evidence is not limited to discovery of the actual product allegedly causing a plaintiff's injury. Drabik v. Stanley-Bostitch, Inc., 1991 U.S. Dist. LEXIS 8694, *2 (W.D. Mo. 1991). Evidence of injuries caused by similar products is relevant to a manufacturer's knowledge of a "defect" and the "danger" associate with the product. Grimes v. Mazda N. Am. Operations, 355 F.3d 566, 573-74 (6th Cir. 2004), *reh'g denied*, 2004 U.S. App. LEXIS 4976 (6th Cir. Mar. 15, 2004); Wheeler v. John Deere Co., 862 F.2d 1404, 1407-1409 (10th Cir. 1988). Moreover, evidence of incidents occurring with substantially similar products, under substantially similar circumstances is generally admissible in a products liability action. *See* Drabik, 1991 U.S. Dist. LEXIS at *2; Levy v. Remington Arms Co., Inc., 836 F.2d 1104 (8th Cir. 1988), Herman v. Andrews, 1999 Mo. App. LEXIS 2441 (Mo. Ct. App. 1999). The product requested to be discovered need not be identical to the product at issue; the alternate product merely needs to be similar to the product involved in the current action. Culligan v. Yamaha Motor Corp., 110 F.R.D. 122 (S.D.N.Y. 1986); Swain v. GMC, 81 F.R.D. 698 (W.D. Pa 1979).

In Herman, a ten-year-old boy was shot in the eye by an air rifle.  Herman v. Andrews, 1999 Mo. App. LEXIS 2441 at *1.  The little boy filed suit against the air rifle manufacturer for strict liability, failure to warn, and for design defect.  Id.  During discovery the plaintiff requested information on the air rifle and information on substantially similar rifles that the manufacturer produced.  Id. at *10-11.  The Court recognized the importance of introducing substantially similar product incidents and allowed the plaintiff access to the alternate product information.  Id. at *12.  The court found that the plaintiff's discovery requests concerning the alternate products were not unduly burdensome.  Id. at 15.

When a party seeks to discover product information that is substantially similar to the product underlying litigation, a defendant should not be the final arbiter of "substantial similarity."  Drabik, 1991 U.S. Dist. LEXIS at *3.  Rather, the party opposing the discovery must delineate the differences between the products tending to make discovery inappropriate.  Culligan, 110 F.R.D. 122.  Generally, different models of a product will be relevant if they share the characteristics pertinent to the legal issues raised in the litigation of the accident-causing model.  Barcenas v. Ford, 2004 U.S. Dist. LEXIS 25279, *9 (N.D. Cal. 2004); In re Richardson-Merrell, Inc., 97 FRD 481 (S.D. Oh 1983) (holding that plaintiffs suing a pharmaceutical company for injuries caused by the chemical Bendectin should be allowed to receive discovery of information, "including testing data," pertaining to the Bendectin and its components so long as the information was kept to the testing of Bendectin and did not include testing data of substances not found in Bendectin.).

Prograf and Protopic are not different drugs.  Their biologic properties are the same.  APUS has not, and cannot demonstrate otherwise.  Fujisawa Healthcare, Inc. ("Fujisawa"), APUS' predecessor corporation, introduced Prograf Tacrolimus (FK 506) into the United States market to treat organ rejection in patients recovering from allogenic liver transplants in April

1994.  Because atopic dermatitis (eczema) is considered an immunologic disorder believed to be modified by T-lymphocyte activation, Fujisawa developed a topical formulation of Tacrolimus, Protopic, for dermatological use.  On December 15, 1994 Fujisawa submitted an Investigational New Drug Application (IND) for Protopic to the FDA to study the use of previously-approved, Prograf, in an ointment form.

Fujisawa and the FDA became aware that Prograf caused cancer.  In fact, the FDA issued a black box warning for Prograf in conjunction with its 1994 approval.[10]  Nevertheless, on December 15, 1994, despite having the knowledge that Prograf (Tacrolimus FK 506) caused cancer, Fujisawa submitted an Investigational New Drug Application ("IND") to the Food and Drug Administration ("FDA") to study Tacrolimus (FK 506) in ointment form, to treat atopic dermatitis.[11]

Fujisawa became aware of Tacrolimus' dangers years before submitting its New Drug Application ("NDA") to the FDA for Protopic's approval.  Tacrolimus is the mechanism upon which the drug company bases Prograf and Protopic safety and efficacy.  Fujisawa acknowledged this during a "pre-NDA" meeting held on April 6, 1999, meeting 3840 with the FDA.  At this meeting Fujisawa proposed to cross reference the Prograf NDA (NDA 50-708) information, previously submitted to the FDA, in support of Protopic's NDA.  The minutes of this meeting reflect that the Fujisawa made the following statement to FDA investigators:

---

[10] The Prograf (*tacrolimus capsules, tacrolimus injection (**for intravenous infusion only**)*) black box warning states:

**WARNING**
Increased susceptibility to infection and the possible development of lymphoma may result from immunosuppression. Only physicians experienced in immunosuppressive therapy and management of organ transplant patients should prescribe Prograf. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for maintenance therapy should have complete information requisite for the follow-up of the patient.

[11] Since atopic dermatitis is considered an immunologic disorder believed to be modified by T-lymphocyte activation, Fujisawa developed a topical formulation of Tacrolimus, Protopic, for dermatologic use.

FK 506 (tacrolimus) drug substance in Prograf was originally approved on April 8, 1994 (NDA 50-708) and the drug substance remains unchanged. The drug substance remains unchanged. The drug substance utilized in Protopic Ointment is tacrolimus, and the chemistry, manufacturing & control (CMC) for tacrolimus remains unchanged from that previously approved. Therefore, Fujisawa is proposing to cross reference the information previously submitted in NDA 50-708 [Prograf®] for the tacrolimus drug substance.

See Plaintiff's Exhibit "4", Memorandum of Meeting, dated April 16th, 1999 re: IND Protopic, Pre-NDA Meeting. (emphasis added). By referencing its Prograf NDA submission, Fujisawa sought to influence the FDA to more readily accept and approve Protopic's NDA. Again, in September of 1999, Fujisawa specifically requested that the FDA cross-reference the Protopic NDA with Prograf's NDA (NDA 50-708, 50-709) and with Tacrolimus FK 506. NDA #50-777, September 8, 1999. NDA #50-777, September 8, 1999. New Drug Application Dated 9/8/1999 re: NDA 50-777 re: Protopic (tacrolimus ointment). Thus, this Court should be incredulous that APUS represents to it that the drugs are different, and irrelevant from each other.

There is additional evidence showing that Fujisawa/APUS has held Prograf and Protopic out as the same drug. A comprehensive examination of the Protopic's NDA (NDA 50-777) reveals hundreds of references to Prograf (NDA 50-708, 50-709). One of the major comparisons Fujisawa made in its Protopic NDA concerned the Chemistry, Manufacturing and Controls submissions, which indicated that Prograf and Protopic's chemical makeup was identical.[12]

---

[12] [3S-[3R* [E(1S*, 3S*, 4S*)], 4S*, 5R*, 8S*, 9E, 12R*, 14R*, 15S*, 16R*, 18S*, 19S*, 26aR*]]-5, 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, 19, 24, 25, 26, 26a-hexadecahydro-5, 19-dihydroxy-3-[2-(4-hydroxy-3-methoxycyclohexyl)-1-methylethenyl]- 14, 16-dimethoxy-4, 10, 12, 18-tetramethyl-8-(2 propenyl)-15, 19-epoxy-3H-pyrido[2,1-c][1,4]oxaazacyclotricosine-1, 7, 20, 21-(4H, 23H)-tetrone, monohydrate. NDA 50-777 Chemistry Review: Review of Chemistry, Manufacturing and Control December 6, 2000.

Fujisawa attempted to utilize Prograf's approved status as a means of promoting and expediting Protopic's NDA. In fact, during the FDA's Protopic approval process, the FDA requested that Fujisawa provide data from its tacrolimus Prograf clinical trial studies (before, during, and after Prograf's approval in April 1994). In a letter dated March 29, 2000 from the Director of the Division of Dermatologic and Dental Drug Products to Fujisawa, they were requested to provide the following documentation in furtherance of the Protopic NDA:

CLINICAL:

1. Please provide data on the relationship of blood levels of FK506 [Prograf] and subsequent development of lymphomas (or post transplant lymphoproliferative disorders) in patients treated systemically with FK506 [Prograf]. Please provide any available information concerning the relative risk of EBV seroprevalence for development of lymphomas (or post transplant lymphoproliferative disorders) in patients treated systemically with FK506 [Prograf].

2. Please provide data on the chronology of lymphoma (or post transplant lymphoproliferative disorders) development in patients treated systemically with FK 506 [Prograf]. Please characterize the chronology of lymphomas (or post transplant lymphoproliferative disorders) development separately in pediatric and adult populations.

3. The sponsor should clarify whether the lymphomas noted in the recipients of Prograf were of a B-cell or T-cell origin. (*See* Plaintiff's Exhibit "8")

The FDA would not have made this request if it thought Prograf was wholly unrelated to Protopic. In reality, the FDA believed Prograf and Protopic were inextricably related.

The FDA, thereby recognized the similarities between Prograf and Protopic. Moreover, the FDA has recommended that Fujisawa use the Prograf pregnancy warning label on Protopic's label. At the "pre-NDA" meeting noted above, the FDA made certain preliminary comments concerning the Submitted Label for Protopic. The minutes of the meeting reflect that the FDA recommended the following:

> In particular, the description of <u>the teratogenic effects of tacrolimus contained in the Prograf label should be incorporated into the Protopic label</u>. If the sponsor should choose to conduct a dermal reproductive toxicity study with the tacrolimus ointment, then the results of this study may then also be incorporated into the Protopic label.

See Plaintiff's Exhibit "4", Memorandum of Meeting, dated April 6th, 1999 re: IND Protopic, Pre-NDA Meeting. (emphasis added).

Fujisawa intended to illustrate the indistinguishable characteristics of both Prograf and Protopic's chemical compounds in order to have the FDA quickly approve Protopic for the U.S. market. Fujisawa, now APUS, knew that referencing Prograf, which, having already been approved, would expedite Protopic's market readiness and overall acceptability. NDA #50-777, September 8, 1999. In its Protopic NDA (NDA #50-777, September 8, 1999) Fujisawa included extensive and wide spread references to Prograf, which included, *inter alia*, Acute Toxicology Studies, Reproduction studies, Fertility Studies, Carcinogenicity Studies, Chemical Structures and compounds. Additionally, APUS' website warns consumers that Protopic may lead to the

same adverse effects as Prograf.[13]  If Prograf and Protopic are truly "disparate," why would Fujisawa continuously interrelate Prograf in Protopic's NDA?  And how can they, therefore, make those contrary representations to this Court?

APUS has argued to the FDA that Prograf and Protopic are the same drug and has disseminated information to that effect.  For instance, on APUS' Protopic website, in the section entitled PRECAUTIONS:  General – Defendant warns consumers of the same adverse effects demonstrated by PROGRAF.  The text states:  *"Transplant patients receiving immunosuppressive regimens (e.g. systemic tacrolimus) are at increased risk for developing lymphoma; therefore, patients who receive PROTOPIC Ointment and who develop lymphadenopaty should have the etiology of their lymphadenopathy investigate."* [www.Protopic.com].  The FDA accepted Fujisawa's argument that Prograf and Protopic are similar drugs.  *See* NDA 50-777.  Moreover, any computerized search for the terms Protopic and Prograf results in numerous references to Tacrolimus, and FK 506 all as synonymous with one another.  The terms Prograf, Protopic, Tacrolimus, and FK 506 are all used interchangeably without distinction, and it is public knowledge to be a fact.  The term Tacrolimus is used to denote both Prograf and Protopic regarding immunosuppression. [en.wikipedia.org/wiki/Tacrolimus; www.dermnetz.org/treatments/tacrolimus.html]

Prograf and Protopic are identical biological entities,  whose chemical properties, structures, manufacturing process, clinical trial safety results, adverse side effects (including pregnancy related side effects) are equivalent.  *See* NDA 50-777.  Fujisawa has made this argument to the FDA.  Id.  The FDA, and other outside public and scientific sources (the PDR), has accepted this proposition.  As such, APUS cannot seriously argue that Prograf and Protopic

---

[13] *See* www.Protopic.com.  The text states: "Transplant patients receiving immunosuppressive regimens (e.g. systemic tacrolimus) are at increased risk for developing lymphoma; therefore, patients who receive Protopic Ointment and who develop lymphadenopaty should have the etiology of their lymphadenopathy investigated."

are "disparate" drugs. Any such assertion, in light of the aforementioned facts, borders on misrepresentation to this Court.

### 3. Third Party Documents

APUS objects to Weiss' informal request that relevant third-party documents be preserved. APUS' MPO Memo. at p. 7-8. More specifically, APUS seeks a Protective Order permitting the destruction/spoliation of "all documents and materials generated by third-party clinical investigators, for any studies involving Protopic® Ointment" APUS' MPO Memo. at p. 2. These documents are within APUS' control, regardless of any possible third-party custody or possession. According to federal law, APUS has the obligation to ensure that these documents are preserved for this, and all other pending and potential litigation. *See* <u>Shaffer v. RWP Group, Inc.</u>, 169 F.R.D. 19, 24 (EDNY 1996); <u>Proctor & Gamble Co. v. Haugen</u>, 179 F.R.D. 622, 631-632 (D. Utah 1998) (Company sanctioned for failing to search for or retain e-mails). Despite this, APUS' requests this Court to enter an advisory opinion granting APUS and their third-party agents the green light to destroy/spoliate relevant documents is both procedurally and substantively inappropriate.

First and foremost Weiss has not propounded any discovery on APUS regarding third-party documentation. Nevertheless, APUS seeks a Protective Order essentially permitting it and its third-party paid agents over which they exercise control to destroy/spoliate potentially relevant, if not crucial, documentary evidence. APUS argues that Weiss has requested "all documents maintained by outside clinical investigators[, and that such documents] would be irrelevant, costly and greatly burdensome on current business operations." APUS' MPO Memo at p. 7. But they have provided no evidence for their statements – only their lawyer's conclusory declarations without factual support. Furthermore, APUS maintains that "the resulting harm from this request that the investigators maintain documents would clearly

outweigh even the slightest possibility of revealing relevant information, or information that is not already in APUS' files." Id. at 7-8. APUS' baseless conclusory statements are easily overcome.

Rule 34(a) of the Federal Rules of Civil Procedure "specifically permits discovery and inspection of [a] matter which is in the 'possession, custody, or control' of a party. Bifferato v. States Marine Corp. of Del., 11 F.R.D. 44, 46 (S.D. N.Y. 1951). "Possession by … a third party of the document or matter required to be produced cannot be used as a means of avoiding compliance with a direction for its production. The true test is control and not possession. *Id.* (internal citations omitted); Alexander v. F.B.I., 194 F.R.D. 299, 301. "[A] party need not have actual possession of documents to be deemed in control of them." In re Folding Cartion Antitrust Litigation, 76 F.R.D. 420, 423 (N.D. Ill. 1977), citing 4A MOORE'S FEDERAL PRACTICE ¶ 34.17 at 34-98.

A party is generally deemed "to have control of documents, only if the party has the legal right to obtain the documents requested upon demand." Searock v. Stripling, 736 F.2d 650, 653 (11th Cir. 1984). "The documents and records that a corporation requires in the normal course of its business are presumed to be in its control unless the corporation proves otherwise. Any other rule would allow corporation to improperly evade discovery." In re Anschuetz & Co., 754 F.2d at 607 at fn. 9 (emphasis added), *overruled on other grounds*, *citing* Cooper Indus. v. British Aerospace, 102 F.R.D. at 919-20, In re Ironclad Mfg. Co., 201 Fed. 66, 68 (2d Cir. 1912).

The relationship between the requesting party and the entity having actual possession of the document is central in each case. Estate of Young v. Holmes, 134 F.R.D. 291, 294 (D. Nv. 1991). If the party is able to command release of the documents by the entity in possession, the commanding party is in control of the documents. *See* Id. "[C]ontrol is usually the result of statute, affiliation or employment." Id.; M.L.C., Inc. v. N. Am. Philips Corp., 109 F.R.D. 134

(S.D. N.Y. 1986) (finding "control" where documents which were originally produced by the party or its agents, and then turned over to an attorney); <u>Cooper Indus., Inc. v. British Aerospace, Inc.</u>, 102 F.R.D. 918 (finding "control" where documents were in possession of Defendant's British affiliate); <u>Contracom Commodity Trading Co. v. Seaboard Corp.</u>, 189 F.R.D. 655, 663 (D. Kan. 1999) (stating that a parent must produce all the documents of its wholly-owned subsidiary)

For example, sponsors of the outside investigations, such as APUS, "monitor…an individual scientist employed by the sponsor of the study to follow the testing and assure the quality of the work performed by the contract laboratory." 2 James T. O'Reilly, Food and Drug Administration §23:8, at 23-31 (2005). When there is clinical testing of drugs like Protopic, that testing involves "agreements between the patient and the drug company." <u>Id</u>. at 23-33. "The sponsor [Fujisawa/APUS] acts in place of the FDA in monitoring studies…" <u>Id</u>. There is no doubt APUS, or its predecessor corporation, exercise control, possession, auditing rights and custody over the investigations and the documents involved in their clinical studies. Fujisawa/APUS hired the investigators doing their clinical studies. *See* 21 CFR § 50.3(c), (d), (e). Responsibilities of sponsors (Fujisawa/APUS) and outside clinical investigations are controlled by 21 CFR §312.50 - §70. These responsibilities between sponsors and their investigators are further guided by specific FDA Guidelines, and ICH policies. (<u>www.fda.gov/Guidance</u> Documents). These third party investigation and clinical trial documents are relevant, and essential. This includes compensation and perks paid and given to these third parties which go to bias of the witness.

Under federal law, APUS' request for a Protective Order permitting its agents and closely related third-parties to refrain from preserving potentially relevant evidence is wholly improper. As a pharmaceutical giant, APUS hires outside investigators to conduct clinical trials and

studies. These clinical investigators are APUS' agents. APUS controls such documents, regardless of whether APUS or the investigative agents possess the documents. This is particularly true of items such as, *inter alia*, underlying patient files from the clinical studies. These files were <u>not</u> given to the FDA, and APUS may not have retained them. Weiss believes these files will support his allegations. Furthermore, third party clinical investigators are required to certify the absence of certain financial interests or disclose those financial interests. (<u>www.fda.gov/cdrh/modact/fr112098a.html</u>) Documentation which supports any evidence of financial interests of Defendants' clinical investigators would be highly relevant as it could demonstrate lack of objectivity on the part of the investigators in conducting Defendants trials.

APUS is essentially requesting the permission to unilaterally decide document relevancy. This is unacceptable. Weiss has not yet propounded discovery requesting any third-party evidence. As such, APUS' request for a Protective Order is premature. Moreover, any clinical investigative evidence or other third-party documents that Weiss seeks preservation of have been created by APUS' agents; entities such as universities, clinicians, and research facilities that APUS hired specifically to conduct studies and prepare investigative evidence pertaining to Protopic. These documents and underlying case files are required for APUS' normal course of business operation, and are thus, presumed to be under APUS' control. *See* <u>In re Anshuetz & Co.</u>, 754 F.2d 602. Therefore, according to Rule 34 and the established federal case law, this Court should deny APUS' request for a Protective Order for all relevant documents that APUS "controls" in its third-party agent's possession.

## IV.    CONCLUSION

APUS has sought a Protective Order to essentially declaring that crucial documentary evidence is "irrelevant." However, APUS' request is both procedurally and substantively deficient. First, APUS does not have standing under Rule 26 to seek a Protective Order at this

time. APUS' request is not ripe for adjudication and is a veiled attempt at seeking this Court's advisory opinion on relevancy. As such, this Court should decline to entertain APUS' Motion. In the event that this Court reaches the substantive merits of APUS' Motion, the substantive deficiencies compel a denial thereof. All foreign Protopic documents are related to the case at hand and are relevant. Similarly, because Prograf and Protopic are the same drug, the Prograf-related documents are relevant. Lastly, all third-party documents that APUS controls are also relevant.

<u>**CERTIFICATE OF CONFERENCE**</u>

Plaintiffs' counsel has conferred with Defendant's counsel in an effort to resolve this dispute, as required under Rule 37(d), Federal Rules of Civil Procedure, and the local rules of this Court, but were unable to reach an amicable resolution without court intervention.

 _/s/Jennifer A. Moore_____
H. PHILIP GROSSMAN
JENNIFER A. MOORE
Fernandez Friedman Grossman & Kohn PLLC
2400 National City Tower
101 South Fifth Street
Louisville, KY 40202
(502) 589-1001
(502) 589-7333 (Fax)
pgrossman@ffgklaw.com
jmoore@ffgklaw.com

And

Larry M. Roth, Esquire
LAW OFFICE OF LARRY M. ROTH, P.A.
1615 Edgewater Drive
Suite 180 [32804]
Post Office Box 547637
Orlando, Florida 32854-7637
Telephone: 407-872-2239
Facsimile: 407-872-6927
E-mail:        lroth@roth-law.com

*Co-Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2006, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

| Attorney: | Party Represented: |
|---|---|
| Sam E. Isaacs II<br>SAM E. ISAACS, PLC<br>401 West Main Street - Suite 303<br>Lexington, Kentucky   40507<br>Telephone:    859 - 232-1044<br>Facsimile:     859 - 231-9639<br>sisaacs@sisaacslaw.com | **NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS INTERNATIONAL AG, NOVARTIS PHARMA GmbH, and ROBIN PETREY RUSSELL** |
| Susan S. Wettle<br>Ann E. Georgehead<br>FROST, BROWN, TODD LLC<br>400 West Market Street, 32nd Floor<br>Louisville, Kentucky   40202<br>Telephone:   502-589-5400<br>Facsimile:    502-581-1087<br>swettle@fbtlaw.com | **ASTELLAS PHARMA US, INC., ASTELLAS PHARMA, INC., and DEAN EGLER** |

I further certify that I mailed the foregoing document and the notice of electronic filing by U.S. Mail to the following non-CM/ECF participants on May 15, 2006:

| Attorney: | Party Represented: |
|---|---|
| Of Counsel:<br>John Fagg<br>Kirby T. Griffis<br>SPRIGGS & HOLLINGSWORTH<br>1350 I Street, N.W.<br>Washington, D. C.  20005<br>Telephone:    202-898-5800<br>Facsimile:     202-682-1639 | **NOVARTIS PHAMACEUTICALS CORPORATION and ROBIN  PETREY RUSSELL** |

| Attorney: | Party Represented: |
|---|---|
| Of Counsel:<br>Harvey L. Kaplan<br>Mark C. Hegarty<br>Laurie A. Henry<br>SHOOK, HARDY & BACON, LLP<br>2555 Grand Boulevard<br>Kansas City, Missouri 64108<br>Telephone: 816-474-6550<br>Facsimile: 816-421-5547 | **ASTELLAS PHARMA US, INC., and ASTELLAS PHARMA, INC.** |
| Of Counsel:<br>Grant J. Esposito<br>Michelle J. Annuziata<br>MAYER, BROWN, ROWE & MAW LLP<br>1675 Broadway<br>New York, NY 10019 | **NOVARTIS INTERNATIONAL AG, NOVARTIS PHARMA GmbH** |

s/ Jennifer A. Moore
Jennifer A. Moore